STATE OF VERMONT

**SUPERIOR COURT**                                          **CIVIL DIVISION**

**Orange Unit Docket Nos. 23-CV-1827**
**23-CV-4940**

**IN RE: ESTATE OF STEWART SKRILL**[1]

**FINDINGS OF FACT and CONCLUSIONS OF LAW**

This matter is before the court for review of three accountings of the Co-Trustees of the Stewart Skrill Living Trust encompassing the period of their trusteeship from November 1, 2017 to July 31, 2020. The Co-Trustees during that period were Steven Modell and Bonnie Lindsay. [2] In addition, current (successor) Trustee Christopher Eckman asserts a claim for breach of trust by the Co-Trustees during their period of administration, and seeks remedies.[3] Specifically, the claim is for breach of trust by "disbursing unreasonable fees and expenses spent on the farm from the trust assets."[4]

The three accountings were originally reviewed in the Probate Division, resulting in an Order that imposed liability on the two Co-Trustees. The findings of the court in the Probate Division and the resulting Order were both appealed to the Civil Division. This court conducted a *de novo* hearing on May 29, June 3 & 4, and July 14 & 17, 2025.

All beneficiaries were notified and given the opportunity to appear and participate. Primary participants at the hearing were Co-Trustee Steven Modell, represented by Attorney Craig Weatherly, and current Trustee Christopher Eckman, represented by Attorney Harold Stevens (trial counsel) and Attorney Paula McCann (co-counsel). The following Trust beneficiaries participated at the hearing on some but not all days: Co-Trustee Bonnie Lindsay representing herself; Karen Skrill (widow of Settlor Stewart Skrill and primary beneficiary), and several secondary beneficiaries: Holly Engel (daughter of Stewart Skrill) accompanied by Communication Specialist Ed Paquin; Colt Engel (grandson), Kurt Engel (grandson), and Daniel Skrill/Eckman (grandson). In addition to their status as Co-Trustees during the period of the accountings, Steven Modell (nephew) and Bonnie Lindsay (daughter) were also secondary beneficiaries.

---

[1] Although both cases are entitled "In re: Estate of Stewart Skrill," the subject matter is actually the private trust entitled The Stewart Skrill Living Trust. A proceeding concerning Mr. Skrill's estate took place in Florida.
[2] From February10, 2020 to July 31, 2020, Steven Modell had resigned as Co-Trustee, leaving Bonnie Lindsay as sole Trustee for that period.
[3] The breach of trust claim was originally asserted by beneficiary Karen Skrill. Shortly before the hearing, she assigned her claims to the current Trustee Christopher Eckman.
[4] Karen Skrill's "Petition to Commence a Trust Proceeding" dated March 29, 2019 and filed in the Probate Division in Docket #94-4-19 Oepr, (Modell Exhibit 5).

1

**Findings of Fact**

The following facts are found to be proved by a preponderance of the evidence based on the credible evidence presented at the hearing before this court.

Stewart Skrill owned a farm in Randolph to which he was very attached. The farm consisted of 280 acres with a farmhouse and a large barn. He grew vegetables and flowers and had sheep. He was divorced and had three adult children, Bonnie Lindsay, Thomas Schilling, and Holly Engel. He also enjoyed relationships with his grandchildren. Karen (later Skrill) began living with him in approximately 1998, and the two of them continued to enjoy farming together. They married in 2000 and continued this life for approximately 10 years.

In 2010, they retired from farming and began going back and forth between the farm and Florida, where they spent winters. They became residents of Florida at some point. Stewart Skrill's adult grandson Daniel Skrill lived on the farm and took care of it and maintained his own modest farming operation there, including raising pigs and other livestock. The terms on which he occupied the property are unknown. Various family members stored possessions in the barn.

In July of 2015, Stewart[5] received a letter from Ranger Solar proposing to purchase a two-year option to buy 250 acres of the farmland for purposes of a solar array. Ranger Solar stated in the letter that it would pay $5,000 for a two-year option period during which it would conduct investigation on the suitability of the site for its purpose. The letter proposed that if it chose to exercise the option, it would pay $10,000 per acre. It is unknown what Stewart's response was to the proposal, but apparently nothing happened. At the time, Stewart had leased an unknown amount of the farm acreage to farmer neighbor Toby Brown for purposes of harvesting hay. This was in a written agreement. The farm acreage was in current use and receiving the property tax reduction benefits related to that program.

In November of 2016, Stewart executed a complete restatement of a Living Trust that he had had in place for some years. It provided that after his death and the payment of debts, taxes, and two specific distributions of $50,000 each, the trust should be administered solely for the support and benefit of his surviving spouse, Karen Skrill.

In the middle of 2017, when he was in failing health, he engaged in further estate planning. He contacted his nephew Steven Modell, who lived in Pennsylvania, and asked him to come to Florida to discuss his estate plan. Mr. Modell had been in the insurance business. Stewart knew that he had been through a bankruptcy. They met and Stewart showed Mr. Modell a copy of a will and trust. Mr. Modell looked at the first pages but did not read the documents. It is unknown whether these were proposed or executed documents. Stewart did not permit his wife Karen to participate in the meeting, and he had not involved her in any discussions about his estate plan. Stewart asked Mr. Modell to be a Trustee of his trust, to which Mr. Modell agreed.

At some point, and it is unknown whether it was before or after this meeting, Stewart's daughter Bonnie Lindsay, who lived in Florida, asked her father who would be responsible for

---

[5] Many persons involved in this situation have the last name Skrill, so that after they are introduced, only their first names will be used.

his financial affairs after his death. She was concerned about the welfare of her brother Thomas Schilling and her sister Holly Engel, both of whom, in her words, have difficulty 'operating in the world.' Other than that conversation, which she initiated, Stewart did not discuss his estate plans with her. She did not know what his plans were.

On October 25, 2017, Stewart executed an Amendment to the Stewart Skrill Living Trust. This 2017 Amendment, Exhibit 9, is the source of the issues in this case. It was prepared by his Vermont attorney, Adrian Otterman, but executed in Florida where Stewart lived. He died a few days later, on October 30, 2017. In both the 2016 Restatement and the 2017 Amendment, both Steven Modell and Bonnie Lindsay were named as Co-Trustees.

Karen notified Mr. Modell who made contact with Ms. Lindsay, as the two of them were named Co-Trustees. While the will is not in evidence, it can reasonably be inferred from the evidence that the will was a pourover will which transferred assets to the Trust, as Trust provisions authorize actions normally carried out by an executor. It was a private trust not subject to administrative oversight in probate court in either Florida or Vermont. Stewart's will was probated in Florida with the help of Stewart's Florida attorney.

The Trust provided for two lump sum payments of $50,000 each to or for the benefit of two named persons. Otherwise, the Co-Trustees were to use the assets for two purposes: to keep the farm as an operating farm and a safe haven for the family, including maintaining it in the current use program if possible, until the death of all of Stewart's grandchildren, and to provide lifetime income for the support of Karen Skrill.

The terms of the relevant Trust paragraphs are in italics as follows. Provisions pertinent to the analysis below are in bold.

### 3.6 RETENTION AND USE OF FARM PROPERTY

*(a)  I direct my trustee to retain, in trust, my farm property located in Randolph Vermont. The Trustee shall* **pay all real estate taxes on the said property out of the income produced by other assets**. *This property is enrolled in Vermont's "current use" program and the trustee shall make reasonable efforts to maintain the property in that program. The trustee shall make reasonable efforts to maintain the property as a functional farm, engaged is [sic] activities such as the raising of livestock, the production of vegetables, haying of the fields or the appropriate harvesting of timber. In furtherance of the foregoing, the Trustee may place a property manager on the property at terms it deems appropriate.*

*(b)  I am concerned about providing my family with a "safe haven" in the event of a national or personal emergency. At all times that the property is held in trust, I direct that it may, temporarily, be occupied by any of the following: My wife, Karen Skrill and her children and grandchildren; any lineal descendant of mine; all of my nieces and nephews; Steven Modell and his children. Any occupation of the property under this paragraph shall be pursuant to the rules and guidelines established by the Trustee named herein.*

*(c) Notwithstanding the foregoing, I hereby authorize my Trustee to transfer up to five (5), two acre building lots and ingress and egress rights of way upon request, to each of: Karen*

*Skrill, each of my 3 children, and Steven Modell. Any recipient of a building lot shall pay any and all costs and taxes associated with such a transfer, including but not limited to, attorney fees, Current Use transfer penalties, transfer property taxes, and any other cost, tax or penalty. [Additional details regarding such transfers omitted.]*

*(d) The Trustee is **authorized to sell portions of the farm property to third parties, but only to the extent required to maintain a fund to pay the real estate taxes** on the remainder of the property.*

### 3.7  SUPPORT FOR SPOUSE
*If my spouse, Karen Skrill, survives me, then after the creation of the education trust, the outright distributions described above, and the retention of sufficient assets to pay the real estate taxes on the farm property, the Trustee shall hold and administer all remaining trust assets for my spouse for the remainder of her life. The Trustee **shall pay all of the net income from the trust property (after the payment of real estate taxes) to her or for her benefit quarter-annually or oftener**, and the Trustee **shall also pay to her or for her benefit from the principal of the trust property such amounts, if any, as the Trustee, in its sole discretion, may from time to time, deem necessary or advisable** for her health, education, maintenance or support and to maintain her in the station of life to which she has been accustomed.  In deciding upon invasions of principal, I direct my Trustee to give consideration to other assets and other sources of income then available to my spouse.  The Trustee need not require the exhaustion of her personal resources as a condition to making such distributions. In making such determination the Trustee may rely on information provided to it by my spouse.*

### 4.3  TRUSTEE DUTIES; POWERS; FEES
*The Trustee shall have all rights, powers, and obligations of trustees as set forth in Title 14A Vermont Statutes Annotated. The Trustee shall be entitled to fair and reasonable compensation for the services the Trustee renders. The Trustee shall be reimbursed for the reasonable costs and expenses incurred in connection with the Trustee's fiduciary duties performed under this Agreement.*

Karen was not at all happy about the Trust provisions. She believed that they were "unworkable" and that the assets should have been exclusively for her support. Mr. Modell's first telephone conversation with Karen about Trust matters was contentious. Each blames the other for lack of civility. They did not establish a cooperative working relationship.

Mr. Modell and Ms. Lindsay prepared to assume their responsibilities as Co-Trustees. Ms. Lindsay lived in Florida, where Mr. Skrill's bank and investment accounts were, and where Karen lived. Mr. Modell lived in Pennsylvania, and the farm property was in Vermont. Mr. Modell and Ms. Lindsay communicated primarily by telephone over the course of their trusteeship. Ms. Lindsay never went to the Vermont farm; Mr. Modell travelled to it periodically.

### Period of Accounting #1: November 1, 2017 to October 31, 2018

Ms. Lindsay and Mr. Modell allocated their shared responsibilities as follows:  Ms. Lindsay was responsible for the financial accounts in Florida, financial recordkeeping, and the

personal property in Florida. Her focus was thus on the Trust provisions for managing Trust assets for the support of Karen.  Mr. Modell, who lived closer to Vermont, assumed greater responsibility for the provisions concerning the farm.  He was worried about the compatibility of the dual roles of the Trust: supporting Karen but also maintaining the Vermont property for the family by keeping it in farming over a long period of time, which in his mind could last 100 years given the ages of family members. They agreed that the signatures of both of them would be required for any withdrawals or expenditures from Trust assets.

Mr. Modell made contact with Stewart's Vermont attorney, Adrian Otterman, who did not wish to be engaged for continued work related to the Trust. Stewart's Florida attorney was engaged in matters related to the Estate. A federal estate tax return was required.

By December 4, 2017, Ms. Lindsay had reviewed the accounts and Karen's needs and she had developed a proposal for an amount of money to be distributed monthly to Karen for her support.  The Co-Trustees arranged for a phone call to take place on January 9, 2018 regarding financial matters. The call was to include Mitchell Devack, Stewart's Florida attorney.  Ms. Lindsay prepared a list of issues to be discussed at the phone meeting. It is unknown what issues were discussed or what decisions were made.

Stewart had personal property in Florida, and Karen had personal property stored in the barn at the farm. Karen was asked to retrieve her personal possessions from the farm. Arrangements for doing so became an opportunity for animosity between Karen and Mr. Modell. He wanted her to remove her things from the farm promptly, and she wanted to do so at times and on terms convenient to her. She sought to do so during summer trips she made to Canada where her daughter lived.

Ms. Lindsay prepared an Inventory of Assets dated January 23, 2018. (Exhibit 8).  It is a very simple summary list showing:

| | |
|---|---:|
| Neuberger Bergman Portfolio | 1,497,700 |
| Sunapee Bank – Vermont | 91,873 |
| Balance in trust account | 29,776 |
| Cash – wallet/rolled loose coin | 237 |
| | |
| Property in Vermont - land only | 2,500,000 |
| Farmhouse/barns/30 acres | 650,000 |
| | |
| 2007 Toyota Prius | 2,184 |
| Gun collection | 9,485 |
| Coin collection | 9,155 |
| | |
| Total Assets | 4,790,419 |

The "land only" item is based on the Ranger Solar 2015 letter. Ms. Lindsay testified that she got the figure of $650,000 for the house, barns, and 30 acres from a realtor. No details are in

5

evidence. The total value assigned to the Randolph farm was thus $3,150,000, whereas the Town's assessment for purposes of property taxation was $615,000.

The Co-Trustees did not obtain an appraisal. The evidence does not support reliability of either $2.5 million for the land or the $650,000 provided by the realtor for the other components. Specifically, the Ranger Solar letter was simply an opening letter that allowed the offeror to spend $5,000 and have a period of two years to explore the viability of the land for its particular purpose. There is no evidence of any action on the proposal. The only evidence about the realtor is that Ms. Lindsay talked with an unidentified realtor who had done a "comparative market analysis" for Stewart in 2015. Specific information from that analysis is unknown. The court finds that the evidence does not support a finding that the fair market value of the farm in October of 2017 was approximately $3 million.

The Co-Trustees established a monthly payment to Karen for her support, which was $3,000 at the beginning but later increased to $3,333, and later increased further. The evidence does not show any issue or dispute about the amount of monthly support payments. The Co-Trustees were worried about Karen making requests for additional amounts. The relationship between Karen and Mr. Modell, which had started as difficult, continued as hostile. In December or early January, Karen informed the Co-Trustees that she wanted to purchase a new travel trailer for her to live in during summer visits to her daughter in Canada. She expected the Trust to pay for it. When Mr. Modell learned of it he called the dealership and arranged for a more advantageous price than Karen had agreed to. Karen was angry about that. The Trust paid for it.

The Co-Trustees wanted to work out an arrangement with Daniel that was consistent with the terms of the Trust. He was the logical person to continue to live at the farm and maintain it in farming and in current use as well as keep it as a "haven" for the family. In addition to the main living space in the farmhouse, there were three separate apartments in the farmhouse and barn that had been and could be rented out and could be made available for use by family members during times of emergency as set forth in the Trust.

Mr. Modell testified that when he went to the farm, he received a hostile reception from Daniel. He claims that on one occasion when he arrived at the farm, a group of people were waiting and yelling as he approached and so he felt threatened and did not stop.

During the first six months, both Mr. Modell and Ms. Lindsay were spending significant time on Trust issues. She obtained information that trustee compensation could be based either on an hourly rate for time spent, which would require recordkeeping, or based on a percentage of the value of assets. She favored percentage of assets in emails to Mr. Modell in February of 2018, and specifically proposed to apply the percentage to asset value using the solar company letter, the Neuberger account, and "additional assets."

By April of 2018, Mr. Modell had begun working with Vermont Attorney Daniel Richardson on issues related to the Trust, including whether Daniel would continue at the farm. No inventory or "report" as required by statute had been prepared and provided to Karen or other beneficiaries. Karen had asked for an accounting. In an email from Ms. Lindsay to Mr. Modell dated April 16, 2018, Ms. Lindsay wrote, "This is the second, or third, time Karen has asked for

an accounting re: the trust. She's fishing to see if you & I have personally taken money to date." The evidence does not show that an accounting was provided in response.

Attorney Richardson prepared and sent to all qualified beneficiaries a Notice to Beneficiaries dated April 20, 2018 which gave them information about the Trust, provided them with a copy, provided names and addresses of the Co-Trustees (Ms. Lindsay in Florida and Mr. Modell in Pennsylvania) and the attorney for the Trust, and their right to request an annual Trustee's Report. The next day, April 21, 2020, he sent a Notice of Proposed Trustees' Compensation. It provided that the Co-Trustees' annual compensation would be 1% of the Trust's principal or $48,000 annually to be shared equally between them. This amount was apparently based on the January 2018 Inventory described above ($4,790,419 treating the farm as having a value of approximately $3 million).[6] There is no evidence showing that the beneficiaries were sent a copy of an inventory of Trust assets.

Mr. Modell wanted Daniel to enter into a formal rental agreement. He offered that Daniel could pay the Trust either rent or a percentage of his farming income, but he wanted a written agreement. Mr. Modell testified that Daniel agreed to pay rent but never did. The evidence does not support the testimony that Daniel never paid rent. Exhibits show that Daniel and Alison Skrill wrote checks to the Stewart Skrill Living Trust in the amount of $1,000 each on June 1, 2018 for June rent and on June 21, 2018 for July rent. Ms. Lindsay testified credibly that Daniel sent rent checks to her, but that she did not deposit them because she was under instructions to hold them rather than deposit them. The reason for such an instruction is unknown.

At some point she was told to deposit the checks. She did on August 9, 2018 but payment on them had been stopped on August 7, 2018. Ms. Lindsay's testimony on this issue is supported by documentary evidence and credible. There was no evidence to explain why the rent checks were not immediately deposited, or whether there was any later contact with Daniel to allow him to replace them, or why payment was stopped. The rent checks suggest that perhaps there was at some point the possibility of an arrangement with Daniel. There was a lack of specific evidence at the hearing about exactly why an arrangement could not be worked out with Daniel except for generalized allegations that he caused problems.

By early June, the State had done an inspection and found that the farmhouse did not meet habitability standards due to lead paint and a sagging floor. It was incumbent on the Trust to cure these problems, no matter who was going to inhabit the property. Ms. Lindsay wrote an email to Mr. Modell and Attorney Richardson questioning whether the need for repairs could be used as a way to get Daniel and Ali, his wife, out.

On June 12, 2018, Ms. Lindsay and Mr. Modell each received $12,000 for trustee compensation for a total of one-half of the $48,000 proposed in the Notice to beneficiaries.

---

[6] Attorney Weatherly asks the court to infer that Attorney Richardson was aware of the fee calculation and did not disapprove it. There is no evidence that Attorney Richardson knew the details of the asset valuation information.

Ms. Lindsay and Mr. Modell concluded that they could not allow Daniel to stay. They both testified that they 'could not work with him,' and they apparently decided to proceed to evict him.

On October 6, 2018, Mr. Modell and Ms. Lindsay each received another $12,000 from the Trust for trustee compensation.

As of the end of this period of the first accounting:

Neuberger Berman stock portfolio: The value of the portfolio had been reduced from $1,627,820 to $1,215,443. During this period, specific legacy distributions had been made, expenses were incurred for estate and trust administration, and investments had been changed to provide a greater income stream for Karen. There is no evidence of liquidation of capital assets for improper purposes.

Attorney fees: Fees paid during this period total $74,992. The amounts are not supported by any time and billing records or invoices describing the work performed. It is likely, given the dates of payment, that some of the work was for Stewart during his life and some was for work that had to be done for the estate and trust during the several months following his death.

Trustee fees: $48,000 was paid to the Co-Trustees based on the calculation that had been communicated to the beneficiaries with no response.

Report/accounting: None had been prepared during this year, despite Karen's requests.

*Period of Accounting #2: November 1, 2018 to June 30, 2019*

By mid-November of 2018, Daniel and Ali had agreed to leave the farm. Their departure was slow due to the necessity of making arrangements for their animals and crops and they were not out until mid-December. Ms. Lindsay testified that the Co-Trustees considered renting to a farmer or placing a property manager on the farm but that Daniel's interactions had scared off both the realtor engaged to find a rental tenant and "the one person" who might have been willing to be a farm property manager. It is not clear whether these efforts were made while Daniel was still on the farm or after he left. The evidence was also not clear as to how hard or long the Co-Trustees actually tried to find a person to engage in farming on the property or to find tenants for the rental units. Ms. Lindsay drew up a list of maintenance and repair items to be done. Vincent Arbuiso was hired to do some repairs and install cameras.

In 2018, Vermont became one of two states where hemp crops could legally be grown under a pilot program, and hemp farming was actively encouraged by the Vermont Department of Agriculture. Farmers who grew hemp that year received a very high price, and there was general enthusiasm in the state for this new form of agriculture. Vincent Arbuiso proposed to rent some portion of the property from the Trust to raise hemp seeds.

Mr. Modell became interested in the possibility of a hemp farm. Ms. Lindsay also became interested. On December 2, 2018, Mr. Modell emailed Vincent seeking information about how much investment from the Trust Vincent's proposal would entail over the first 6 months as well as anticipated revenues and proposed percentage splits. The same day, Ms. Lindsay emailed to

Vincent that she was in "basic agreement with the plan [apparently a proposal made by Vincent] going forward." Details of the plan are unknown. It is unknown whether Mr. Modell responded.

On December 5, 2018, Mr. Modell emailed Matt Leonetti, a hemp business consultant, seeking consulting services to develop a business plan for the startup of a hemp business. Mr. Leonetti responded promptly that he would be glad to help. He developed a plan that was not limited to growing a hemp crop but was a "diversified vertically integrated business model" including manufacture of hemp products. His recommendation was to "monetize the crop a few different ways, IE: trimmed colas, biomass, extracted oils and possible early season seedling sales." (Exhibit 13). It projected itemized expenses of $154,000 for implementation and after-sales expenses (brokerage fee and taxes) of $151,000. Mr. Modell rejected Vincent's proposal because he did not believe that Vincent had a good business plan. He proceeded to work with Mr. Leonetti on the business plan he recommended.

Also in early December of 2018, Attorney Richardson recommended a law firm that specialized in organizing hemp businesses. As the momentum toward operating a hemp business on the farm grew, Florida accounts were transferred to Mr. Modell, and beginning in December of 2018, assets of the Trust began to be withdrawn to pay expenses associated with creating the hemp business.

In January of 2019, a Florida attorney for the Estate prepared and filed the Form 706 estate tax return. Schedule M of that return shows a value of $1,640,920 in a trust for decedent's surviving spouse qualifying for the estate tax marital deduction. While there is a rider referenced on the schedule that presumably shows the basis for that amount, it is not in evidence. It appears that the figure is close to the value of the Neuberger Berman account plus cash in banks. The form also shows "Vermont Farm Property Trust" as a beneficiary and shows a value of $500,000. This seems to be a value for the farm real estate in the Trust although there was no credible reliable testimony about this document. Mr. Modell testified at the hearing about the meaning of the document, but his testimony did not appear to reflect a fully accurate understanding of it.

Federal law changed in 2019 to allow the growing of hemp, and many hemp farms were started nationally.

Mr. Modell hired Attorney Timothy Fair to organize an LLC for the purpose of operating a hemp business. It was named the Stewart Rose Farm LLC. The Stewart Skrill Living Trust was identified as the Founding Member. The attorney filed the required documents with the Secretary of State. The LLC Operating Agreement that was signed by Steven Modell references a date of January 14, 2019.

The hemp farm and business was operational from approximately March of 2019. There were 13 acres of field that qualified for organic hemp farming, but the Co-Trustees realized that those fields were subject to the lease with Mr. Brown for haying so could not be cultivated for growing organic hemp. The lease had been among Stewart's papers reviewed by Ms. Lindsay. The Co-Trustees provided no explanation of why they did not recognize this complication earlier. The Co-Trustees attempted to get Mr. Brown to relinquish his right but he had fertilized those hay fields and declined to do so. The result was that the hemp plan was not abandoned but

9

the hemp had to be grown in special bags that lay on the ground rather than in the soil in the field, This entailed significant increased expenses to purchase both the required bags and the specialized soil, and the hemp could not be certified organic.

Mr. Modell assumed primary responsibility for the hemp business. Several people were hired. None had prior experience with hemp farming or farming in general. Some of them were relatives of Mr. Modell and some were given accommodation in various rooms in the farmhouse or apartments. Ken Nelson, a contractor from New Jersey, who later became Mr. Modell's brother-in-law, was hired to be the overall manager of Stewart Rose Farm LLC. He moved to Vermont for the job and lived in the farmhouse and did not pay rent. He became active in marketing and sales. His son Kenny was also hired as an employee. Margaret Nelson, Mr. Modell's former rowing coach, was hired and moved to Vermont to be operations manager. She was also given living quarters on the farm. There were 6-10 employees.

On March 1, 2019, Ms. Lindsay sent an email to Ken Nelson and Mr. Modell concerning purchasing packaging for hemp products such as tinctures, oils, infusions, lotions, and vape cartridges to be sold. This reflects the business plan that was not just for farming an agricultural hemp crop but included manufacture and sale of a variety of products made from hemp. Both Co-Trustees were actively engaged in the enterprise at this point.

On March 20, 2019, Mr. Modell created a document in which he projected revenue from the hemp business. He expected expenses to be $495,000 and retained earnings to be $100,642. He did not identify where the money for expenses would come from but by this time Mr. Modell had taken over management of the Trust assets and was withdrawing funds for hemp business expenses. No loan or other documents were created to memorialize any financial relationships between the Trust and the LLC. All money for the expenses of the hemp business came out of Trust assets. Mr. Modell visited the Vermont property occasionally. When he did, Trust funds were used to pay for his rental car, meals, and overnight accommodations.

Karen was not at all happy about the Trust situation in general. In April of 2019, she filed a petition in the Orange County Probate Division in which she sought:

- Removal of the Co-Trustees and appointment of a successor Trustee
- Modification or termination of the 2017 Amendment
- Requirement that the Co-Trustees file an accounting[7]
- Reformation of the trust to make Karen Skrill the primary beneficiary with the right to occupy the farm and allow the sale of building lots to her and Stewart's descendants.

In her petition, Karen described the farm property as having a value of $615,000, the amount of the Town assessment. She did not mention the hemp farm which was then in operation. This was 1 ½ years after Stewart's death. The Co-Trustees had not yet provided the beneficiaries with an accounting despite her requests. Her petition resulted in the opening of the underlying case in the Probate Division which is the case from which this probate appeal arose.

---

[7] The present proceeding is a *de novo* trial on only this portion of the petition. The orders on this portion of the petition were the ones that were appealed to this court in the docket numbers.in this case.

10

Throughout the 2019 season, the hemp business was fully operational. Mr. Modell described his role as that of Chief Financial Officer. He was not involved in day-to-day operations in Vermont. In his words, he was a "delegation manager." As noted above, the operations did not just include growing a hemp crop, but also included the manufacture of a variety of hemp products and sale of them in New Jersey and on the internet. $45,000 was spent to buy hemp flower when the farm's hemp crop was not yet ready for harvest. The manufacture and packaging of products took place in the farmhouse and barn in Vermont by the employees working and living there except that some of the manufacturing took place in New Jersey. Mr. Modell made sales of products from New Jersey and accepted commissions in addition to and separate and apart from his Trustee compensation. In an email to Ms. Lindsay in May of 2019, he argued that responsibility for sales was an important role for which he should be compensated like any other employee, presumably in addition to trustee compensation. He maintained control of the financial assets of the Trust. The case filed by Karen became actively litigated.

Due to the enthusiasm for hemp farming in 2019, many hemp farms were started, and as a result, a huge supply of hemp was grown nationally and the price paid to growers crashed. During 2019 and 2020, many hemp farms failed.

As of the end of the period of the second accounting:

Neuberger Berman stock portfolio: The Co-Trustees had invaded the principal of the stock portfolio to pay expenses related to starting and operating a hemp farm and business. The value of the portfolio was reduced from $1,215,443 to $902,439.

Attorney fees: During this period, attorney fees were paid to five law firms in the total amount of $45,800. This included three payments to Attorney Mitchell Devack, Stewart's Florida attorney, totaling $11,263.60. There is no explanation of why his services were needed during this period as he was the attorney for the estate and the will had already been probated. A different law firm prepared the estate tax return.

Trustee fees: On April 17, 2019, Ms. Lindsay and Mr. Modell were each paid $11,250 for trustee fees.

Report/accounting: No report or accounting was prepared during this period, which ended 20 months after the start of the active administration of the Trust. No accounting had been provided in response to Karen's requests or to the petition she filed with the court.

### Period of Accounting #3: July 1, 2019 to July 31, 2020

In July of 2019, Mr. Bonaventure, Mr. Modell's New Jersey accountant, was apparently working on preparing accountings. Ms. Lindsay sent him an email which appears to set forth responses to specific questions he had posed. One question was apparently the purpose of the work done by several different law firms. With respect to Florida Attorney Mitchell Devack, she responded that he had originally been retained for work at the time of Stewart's death, but has "since served as 'overseer'/'reviewer'/second opinion' for us." Attorney Richardson was the Co-Trustees' primary attorney. She did not explain why a second advisory attorney was needed.

On September 13, 2019, the Co-Trustees filed with the court the following accountings:

> Accounting #1 (for the period from November 1, 2017 to October 31, 2018), and
> Accounting #2 (for the period from November 1, 2018 to June 20, 2019).

A Profit and Loss statement for Stewart Rose Farms LLC for the period January 1 to November 13, 2019 showed net income was –$391,527.92. It is not clear that this document was shared with the beneficiaries. The funds to cover expenses had come from Trust assets. Expenditures included a tractor, trailer, truck, camper, and utility vehicle. Expenses also included $30,542.18 in commissions paid for sales, including commissions paid to Mr. Modell.

By the end of 2019, the relationship between Ms. Lindsay and Mr. Modell had deteriorated. In May, they had had a testy email exchange about Mr. Modell taking commissions on hemp product sales, which Ms. Lindsay questioned. By the end of the year she was no longer in support of the Trust operating the hemp business. Mr. Modell had taken over running it, including both business and financial decision-making and sole management of a Stewart Rose Farm LLC bank account he had set up in New Jersey. Hemp flower was being shipped to New Jersey for sales. The business was purchasing and using or selling hemp grown on other farms. Employees of the business were assembling and packaging hemp products such as oils and cigarettes in the farmhouse and barn and living in the various living units in the house and barn. It is a reasonable inference that the farm was not available to Stewart Skrill family members as a "safe haven," nor were the various living units available to rent to tenants to generate income for the support of expenses of the farm.

In late 2019 or early 2020, during a break in the litigation in the Probate Division on Karen's petition, Mr. Modell expressed a desire to resign as Trustee. He testified that this was due to the fact that Ms. Lindsay was not on board with the hemp business, and that it was a lot of work and presented a lot of problems, and that people were belligerent.

Mr. Modell resigned as of February 10, 2020 as stated in an Order of the Probate Judge dated April 14, 2020 recognizing his withdrawal. In an email dated January 17, 2020 he had indicated he was ending his involvement although he volunteered to help for two weeks with transition to Ms. Lindsay.[8]

In 2020, Attorney Richardson prepared a promissory note from the LLC to the Trust in the amount of $240,000. Ms. Lindsay testified credibly that this represented approximately half of the funds taken from Trust assets to fund the hemp business. Mr. Modell signed the note on behalf of Stewart Rose Farm LLC and backdated it to January 1, 2019. The evidence supports a finding that this note does not represent all the withdrawals from Trust assets taken to fund the hemp business.

---

[8] Later, on May 11, 2021, a year after his resignation as Co-Trustee, Mr. Modell signed Accounting #3 representing the period from July 1, 2019 to July 31, 2020.

Following Mr. Modell's withdrawal as Co-Trustee, Ms. Lindsay functioned as sole Trustee for a period of time. She closed down the hemp operation. She had difficulty obtaining records from Mr. Modell, who had maintained some accounts to which she had no access.

In March of 2020 she sent a letter to beneficiaries stating that she would like to start the distribution of Stewart's personal belongings. Colt Engel (Stewart's grandson) responded that he was willing to accept "all or any of Grandpa's guns. For safe keeping, and family use." Ms. Lindsay responded that she was postponing distribution of the belongings and would revisit "when things settle a bit."

Although Mr. Modell resigned as Trustee, he wanted to continue running Stewart Rose Farm LLC or at least be involved in winding it down, and did so for a while. He had opinions about how the winding down should occur as well as proposals for disposition of equipment and assets. Eventually he was advised by counsel that he could not continue to be involved.

As of the end of the period of the third accounting:

Neuberger Berman stock portfolio: The Co-Trustees had continued to invade the principal of the stock portfolio to pay expenses related the hemp farm and business. The value of the portfolio was reduced from $902,439 to $566,097. Stewart Rose Farm LLC owed the Trust $485,171.59.

Attorney fees: Attorney fees were paid in the amount of $57,704.  A total of $8,862.50 was paid to: "The Law Offices of . . . [cut off]" This was likely a reference to the firm of Mitchell Devack, as all other listings of his firm began this way.

Trustee fees: Ms. Lindsay received payment of $4,000 for trustee compensation during this period. The amount is reasonable in relation to the extent of her responsibilities during this period in winding down the hemp project, preparing records for transition to Trustee Eckman, and maintaining support payments to Karen.

Report/accounting: Accountings #1 and #2 were filed on September 13, 2019, nearly two years after the start of the active administration of the Trust. Accounting #3 was dated July 31, 2020 and apparently not filed with the Probate Division though presented at the hearing before the Master, and it was admitted into evidence at the hearing in the present case.

**After July 31, 2020**

Ms, Lindsay did not want to continue as Trustee, and a nephew of Stewart, Christopher Eckman agreed to assume the role. The records of the Trust that Ms. Lindsay had taken over from Mr. Modell were in disarray, and Mr. Eckman needed them. He reached an agreement with Ms. Lindsay in August of 2020 that she would turn over all the records to him and help him understand them in exchange for a release.  Mr. Eckman became sole successor Trustee in August of 2020. This case does not concern any accounting for the period beginning August 1, 2020 when Mr. Eckman became Successor Trustee.

Despite terminating her role as Trustee and turning over the trusteeship to Christopher Eckman, Ms. Lindsay did not distribute or transfer the guns in Stewart's gun collection, and she retains possession of the gun collection.

The Probate Judge appointed a Master to conduct hearings on the Co-Trustees' accountings and prepare a Report. The recommendations were adopted in an Order in March of 2023. It imposed liability on both Mr. Modell and Ms. Lindsay as Co-Trustees for the period of their trusteeship. Mr. Modell appealed, which led to this *de novo* proceeding in the Civil Division. Ms. Lindsay initially also appealed but later dismissed her appeal. As the undersigned has repeatedly told the parties, this court has not read the Master's Report in order not to be influenced by it in deciding this case in a *de novo* hearing.

In March of 2024, a "Settlement Agreement, Indemnification and Release" was executed. The parties were Ms. Lindsay, Successor Trustee Christopher Eckman represented by Attorney Paula McCann, and Karen Skrill represented by Attorney Harold Stevens. Under the agreement, Ms. Lindsay paid the Trust $55,000, gave up any claim to Trust property, and withdrew her appeal of the March 2023 Order that made her liable to the Trust. The Trust and Karen gave up any right to collect any further payment from Ms. Lindsay. Thus it appears that Trustee Eckman does not intend to pursue claims against Ms. Lindsay. That does not change this court's obligation to review the accountings of the Co-Trustees, both of whom were equally responsible, and the claims against them based on the standards they were required to meet during the period of their trusteeship.

## Conclusions of Law

### Standards of Trustee Performance

Under Vermont law, "[a] trustee is a fiduciary who owes duties of loyalty, disclosure, impartiality, and prudence to the beneficiaries, 14A V.S.A. §§ 802–804, 813. A trustee must "administer the trust in good faith in accordance with its terms and purposes and the interests of the beneficiaries and in accordance with this title." 14A V.S.A. § 801. "A trustee shall administer the trust solely in the interests of the beneficiaries." 14A V.S.A. §§ 802(a). "A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution." 14A V.S.A. § 804. The trustee must also "take reasonable steps to . . . protect the trust property," 14A V.S.A. §§ 809.

"A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." 14A V.S.A. § 1001(a). Remedies for breach of trust may include an order to "compel the trustee to redress a breach of trust by paying money, restoring property, or other means." 14A V.S.A. § 1001(b)(3).

Vermont has adopted a version of the Uniform Prudent Investor Act. 14A V.S.A. § 901 *et seq*. Except as modified by the provisions of a trust, "a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this chapter." 14A V.S.A. § 901(a).

The prudent investor rule in Vermont's statute sets forth requirements pertinent to the issues in this case as follows:

"(a) A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and

(b) A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

(c) Among circumstances that a trustee shall consider in investing and managing trust assets are such of the following as are relevant to the trust or its beneficiaries:

(1) general economic conditions;
(2) . . .[omitted]
(3) . . .[omitted]
(4) the role that each investment or course of action plays within the overall trust portfolio . . . [omitted]
(5) the expected total return from income and the appreciation of capital;
(6) . . . [omitted]
(7) needs for liquidity, regularity of income, and preservation or appreciation of capital; and    (8) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

14A V.S.A. § 902(a)–(c).

"Compliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight." 14A V.S.A. § 905.

In addition to the prudent investor rule, there are separate requirements with respect to the obligations of trustees to report to the beneficiaries.

"A trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Unless unreasonable under the circumstances, a trustee shall promptly respond to a beneficiary's request for information related to the administration of the trust." 14A V.S.A. § 813 (a).

"A trustee shall send to the distributees or permissible distributees of trust income or principal, and to other beneficiaries who request it, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust assets, and, if feasible, their respective market values."  14A V.S.A. § 813 (c).

**Application of Standards to Provisions of the Trust and the Facts**

The Co-Trustees have the obligation to show in their accountings (reports) their compliance with their duties in handling trust assets. In reviewing an accounting, "the court may . . . adjust the accounts between the parties. . ." 12 V.S.A. § 4255. Thus Trustees may be denied approval as to unjustified expenditures and ordered to restore to the Trust amounts improperly spent by them. With respect to the claim against the Co-Trustees for breach of trust, Trustee Eckman has the burden of proof. 14A V.S.A. § 1002 (a).

At trial, Attorney Stevens asked the court to take judicial notice of a ruling made by Judge Bent on a separate probate appeal to the Civil Division that apparently reformed the Trust to make its sole purpose the support of Karen. He asked the court to apply that purpose in this case. The ruling referred to was made well after the period of administration covered by the three accountings at issue, which ended on July 31, 2020. The performance of the Co-Trustees in this case is to be evaluated in relation to the terms set forth in the 2017 Trust Amendment which were the ones applicable during their period of administration, rather than retrospectively based on a later reformation of the Trust.[9]

The two primary assets were a stock investment portfolio at Neuberger Berman of roughly $1.5 million and a 280 acre farm that included a farmhouse and barn and three rental units. In addition, there was over $100,000 in cash and various items of personal property.

The structure of the 2017 Trust Amendment set forth the priorities for the use of the assets:

- Payment of expenses of Estate: debts, funeral and administrative expenses, and taxes (¶3.3)
- Specific legacies totaling $100,000 (¶¶3.4 and 3.5)
- "Retention and Use of Farm Property" (¶3.6): maintenance for beneficiaries
- "Support for Spouse" (¶3.7): income from stocks to be paid for Karen's support
- Plan for after Karen's death: provisions for maintenance of farm and distribution of assets to children and grandchildren, followed by donation of remaining farm property to a non-profit upon death of last surviving grandchild (¶¶3.8 and 3.9).

After payment of expenses and legacies, the terms for the farm came next. The instructions are clear that the money to be used to pay property taxes should come out of "the *income* produced by other trust assets" (emphasis added), in other words, out of income only, not a liquidation of principal. If there were insufficient funds to pay property taxes out of income generated by the principal of trust assets, then the Trustee is directed not to liquidate investment assets but to sell off land to the limited extent necessary to create a fund for the payment of property taxes. It is clear that the Trustees were required to maintain the stocks to generate income primarily to provide support for Karen Skrill, though some stocks could be set aside and the income used for property taxes.

---

[9] The undersigned has not read the Judge Bent ruling so as not to be influenced by it.

16

Paragraph ¶3.6 is silent as to the source of funds that might be needed for maintenance and repair of the farm property. It is reasonable to infer that necessary maintenance and repair expenses (such as removal of lead paint and structural failures necessary for habitability) should be treated like necessary property taxes, as the farm could not be maintained over time for its stated purpose without periodic necessary maintenance. There were three rental units on the farm that could be rented to produce income for the Trust and would thus be able to help with the generation of income to pay property taxes and maintenance costs.

Selling "portions" of the land was specifically authorized to the extent necessary to pay property taxes, but by inference that could include maintenance costs not covered by income from farm rentals. There was no authority to invade the principal in the Trust--the Neuberger Berman portfolio--for property taxes or maintenance. The clear intent was to maintain the portfolio principal to generate income for Karen.

In ¶3.7 on "Support for Spouse," instructions specifically provide for all remaining trust assets to be held and administered for the support of Karen (after legacies are paid and a fund set aside to pay real estate taxes). "The Trustee shall pay *all* of the net income from the trust property *(after the payment of real estate taxes)* to her or for her benefit. . ." (Emphasis added.) While the Trustees are authorized to set aside some assets to generate a fund for the payment of real estate taxes, there is no authority to invade the principal of the assets. In other words, the stocks in the Neuberger Berman portfolio were not to be liquidated to pay farm expenses. This paragraph for the support of Karen is explicit that principal may be invaded for Karen's support, but no where in the Trust Amendment is there authority to invade the principal for any other purpose than support of Karen. If income from principal was insufficient pay property expenses as well as support for Karen, the remedy was to sell land to cover the property expenses.

In short, there was no authority to convert stocks and bonds in the Neuberger Bergman account, which constituted trust principal, to cash to pay for the development of a hemp farm and business on the Randolph farm.

**Management of Assets by the Co-Trustees**

During the first year of the Trust, November 1, 2017 to October 31, 2018, the facts show that the activities of the Co-Trustees were largely appropriate. Assets were identified, taxes addressed, legacies paid, financial administration was organized, an income stream was established for Karen's support, and attention was devoted to whether an arrangement could be made with Daniel as resident farmer on the Randolph farm. While the Co-Trustees failed to provide Karen with an accounting when she requested it and used an unjustifiable figure as the basis for trustee fees, it does not appear that there was any misuse of Trust principal.

During the eight months of the second accounting, November 1, 2018 to June 30, 2019, the situation was quite different. By mid-November, it was clear that Daniel would be leaving the farm by mid-December, and that repairs were needed to make the farmhouse meet standards of habitability for a replacement tenant. While there is some scanty evidence that the Co-Trustees made some effort to locate a replacement (contact with a realtor and a possible farm manager), there is no evidence that the Co-Trustees made diligent efforts after Daniel was gone to do

17

repairs to be able to rent to a farm tenant and rent the apartments for income. On the contrary, even *before* Daniel had left, Mr. Modell was already working on plans for the farm in which he expected to invest funds from the Trust. Specifically, he asked Vincent Arbuiso how much the Trust would need to invest under his proposal, and he retained Mr. Leonetti as a hemp expert to develop a business plan that would entail use of Trust assets for startup expenditures.

From December 2018 through the end of the accounting period, the main event was the decision to pursue a hemp farm and related production business as well as the implementation of that plan through the creation and operation of Stewart Rose Farm, LLC, including the purchase of equipment and the hiring of employees. The Co-Trustees had rejected Vincent Arbuiso's proposal to rent the farm to grow hemp seeds. Presumably all the financial risks of his plan would have been on him, the property would have qualified for current use, and the rental units as well as the house and barn could have been rented to generate income for property taxes and maintenance costs. The court does not have enough evidence and does not conclude that the Vincent Arbuiso proposal would have actually been a prudent course for the Co-Trustees to pursue, but superficially it appears that such an arrangement, either with him or someone else, presented a possibility that would have been consistent with the terms of ¶3.6 of the Trust and would also have allowed income to be generated by rental of the three apartments.

Instead, even before Daniel had left the farm, the Co-Trustees quickly began to pursue a high-risk business venture that entailed significant expense and resulted in the liquidation of the principal of trust assets. Beginning in December of 2018, the Co-Trustees started invading the income-producing investments in the Neuberger Berman portfolio to pay for development of a hemp farm and related manufacturing business.

During this period, the Co-Trustees appear to have spent Trust assets freely. On December 21, 2018, Mr. Modell was paid $1,694.76 for a 4-day trip to Vermont ending December 3, 2018, and in January he was paid $408.45 for a January trip to Vermont. Thomas Grace, Ms. Lindsay's son, was paid $444.91 for two trips to Vermont for unknown reasons. Ms. Lindsay was paid $6,238.94 for unspecified and unexplained "trustee expenses." $48,348.32 was paid for unidentified legal services.

Between January and June of 2019, $68,249.96 was paid for farm and barn renovations. In addition, PW Properties was paid $10,000 for unspecified purposes. While the court understands from the evidence that expenditures were necessary during this period to cure habitability deficiencies in the farmhouse, there are no invoices to describe the work actually done and no evidence that the amounts spent were reasonable for the work. It is not clear whether expenditures were to address habitability deficiencies or to accommodate the hemp project. Nearly $2,000 was paid for unknown forestry services.

On April 17, 2019, Ms. Lindsay and Mr. Modell were each paid $11,250 for trustee fees. As of that date, the Co-Trustees had not yet provided any accountings to the beneficiaries. That same month, Karen filed her lawsuit seeking accountings and damages for breach of trust as well as other remedies.

18

The stock portfolio of the Trust designed to generate income for Karen was reduced from $1,215,443.82 to $902,439.41 as of June 30, 2019, the end date of Accounting #2, indicating that approximately $300,000 had been liquidated, much of it to fund the hemp operation during that 8 month period. Some of that was replaced by the Stewart Rose Farm promissory note, which did not generate income. The hemp project was a high-risk venture in an untested enterprise that required significant capital investment for start-up costs and was created at a time when the price payable for hemp was destined to fall, and did fall, because so many others started hemp farming at the same time. The business was run from New Jersey by Mr. Modell who acted as a remote "CEO." The work was done by employees hired with no background or knowledge of Vermont agriculture in general or hemp farming in particular. They were given residential living quarters as well as compensation funded by liquidation of a portion of the trust corpus that was dedicated by the terms of the Trust to provide income support for Karen.

The goal of Stewart Rose Farm LLC was not maintenance of an agricultural way of life but a business venture that included manufacture and sale of hemp products from hemp flower purchased in part from other growers. The rental units at the farm were occupied by employees who also used the farm buildings as a site for manufacturing and packaging hemp products, and consequently the farm was not available to Skrill family members as a "haven," nor did it generate income for the payment of property taxes and maintenance expenses. Marketing and sales were conducted largely from New Jersey. Mr. Modell accepted commissions on sales in addition to collecting trustee compensation, and managed accounts to which Co-Trustee Ms. Lindsay had no access. The stock portfolio was used as if it were a checkbook to provide a source of funds for activities that were not authorized by Trust provisions for either the use of the farm property or the support of Karen. The farm was the site of a corporate venture and not a place where a rural farming way of life was maintained in a place preserved as a "safe haven" for the benefit of family members when they needed it.

The court concludes that during the period of Accounting #2, the Co-Trustees violated the prudent investor rule in Title 14A by converting $300,000 of the Neuberger Berman stock portfolio, which was designed to provide income for the support of Karen, to cash and spending it to fund a highly speculative business venture. This reduction was replaced in part by an unsecured promissory note that generated no income and is now worthless. They also breached their duties required by law as trustees, and damaged the beneficiaries, particularly Karen, by reducing the income that should have been available for her support in violation of the Trust provision that invasion of stock principal was authorized only for the support of Karen.

Mr. Modell testified that the business was conducted based on the advice of experts. He appeared to be referring to Mr. Leonetti for the business plan and Attorney Fair for the creation of the Stewart Rose Farm LLC, but there is no evidence that the Co-Trustees sought or received any legal opinions that (a) they had the authority under the terms of the Trust to liquidate any portion of the principal of the stock portfolio (once debts, taxes, and legacies were paid) to use for a purpose other than providing financial support for Karen, or (b) that creating a hemp farm and business during the 2019 hemp boom staffed by employees inexperienced in farming or the

19

hemp product business was an investment that satisfied the requirements of the prudent investor rule applicable to them as trustees.

During the 13-month period of the third accounting, July 1, 2019 to July 31, 2020, Trust principal generated only $23,083.05 in income. Payments for Karen's support totaled $58,929.07, indicating the extent to which invasion of principal had reduced the capacity of the Trust to generate income for the benefit of Karen. (Receipts during the first accounting period had been $60,969.) Total disbursements were $95,888.30, including $57,704.01 in legal fees. (This period included litigation on the issues raised in Karen's petition.)

By the end of 2019, the Co-Trustees were in conflict as to continuation of the hemp business. Mr. Modell resigned as Co-Trustee on February 10, and Ms. Lindsay functioned as sole Trustee thereafter. She terminated the hemp business and coordinated transferring the trusteeship to Christopher Eckman. This entailed obtaining information and records about accounts created by Mr. Model to which she did not have access. She was paid $4,000 in trustee compensation.

Thus during the first seven months of this period, the hemp business continued. When the trusteeship was eventually turned over to Christopher Eckman following July 31, 2020, the value of the Neuberger Berman account was down to $566,097.02, approximately half of what it was on October 31, 2018 at the end of Accounting #1 ($1,215,443.82) following initial estate and trust administrative expenses and distributions and before the hemp business was started. The accounting ending July 31, 2020 shows that the Stewart Rose Farm LLC owed the Trust $485,171,59. It is likely that the amount spent on the hemp business exceeded that amount, as some of the other expenditures were probably related to the hemp venture but that cannot be determined due to the lack of invoices with descriptions or other evidence showing the purposes of the services or items for which payments were made.

The conversion of stocks to cash to pay expenses for the hemp project resulted in a reduction in the amount of income generated by the Trust for Karen's support. In invading the Trust principal in this manner, the Co-Trustees violated the specific terms of the Trust and violated the prudent investor rule by engaging in a highly speculative business venture that resulted in the waste of Trust assets.

The Trust and its beneficiaries were damaged by the failure of the Co-Trustees to manage the Trust principal in accordance with the instructions in the Trust and by the breach of trust represented by the invasion of principal to fund a high-risk speculative business enterprise that resulted in significant loss of principal and consequential reduction of income.

The current Trustee, Mr. Eckman, seeks to hold the Co-Trustees responsible for the loss of $485,171,59 as shown on Accounting #3 as the amount due from Stewart Rose Farm LLC, plus interest on that amount.

20

**Other issues in the Accountings**

All three accountings were filed late and were incomplete. The Co-Trustees failed to provide any accounting in response to Karen's multiple requests as they were required by statute to do. When ultimately filed, the accountings did not include all assets, specifically the farm property, Prius, or gun and coin collections. A proper "report" as required by statute should show the activity and status with respect to all assets. The Co-Trustees failed to meet their obligation to provide the beneficiaries with statutorily required "reports" that were timely and complete.

Trustee Eckman argues that all three of the accountings are defective in that they were prepared by an accountant who is not a licensed CPA in Vermont. There is no requirement that probate accountings be prepared by a licensed CPA. In this decision the court analyzes the accountings based on their content and not the licensure status of the preparer. There is no evidence that the three accountings do not portray accurately the amounts and dates of transactions in the financial records of the Trust.

While the accountings list the amounts of transactions, they do not provide support for the legitimacy of the expenditures. There are no invoices to show the work performed, and no evidence offered at the hearing, either by documents or testimony, to show that the work performed was reasonably necessary for estate or trust administration. Mr. Modell testified that the amounts were accurate based on invoices and financial records, and that the accountant took the figures directly from Quickbooks. The accuracy of invoice amounts is not at issue. What is missing is documentary or testimonial evidence about the necessity of the services and the reasonableness of the fees charged. Although the accountings themselves are lacking in specific support for many expenditures, and the problem was not cured by either testimony or exhibits at the hearing, the court recognizes that administration of the trust entailed significant work, including the services of attorneys and other professionals. Therefore the court declines to disallow those except where the evidence shows an apparent lack of reasonable need or a conflict with the requirements of trust provisions.

Mr. Modell was reimbursed $870.34 for travel expenses. Trustee Eckman argues that Mr. Modell should not have charged the Trust for car rental, meals, and hotels for the trips he made to Vermont. To some extent, such charges are justified in that Stewart made him Co-Trustee knowing that he would need to travel to Vermont periodically from his home in Pennsylvania, and so it is justifiable that the Trust would cover expenses in reasonable amounts. It is not clear why it would not have been sufficient for him to charge for mileage rather than car rental, and to stay in one of the apartments on the property rather than in a commercial hotel. However, the court declines to disallow these expenses as there is some justification for them due to the distance from Mr. Modell's residence. In addition, space may not have been available for him at the farm at the time of his trips, and the availability of an automobile is unknown. Ms. Lindsay was reimbursed $1,884.57 for trustee expenses, without identification of what the expenditures were for although she told the accountant in an email that she had receipts. While the amount could possibly be justified, it was not; nonetheless, the court cannot conclude that it was unreasonable given the responsibilities of the Trust during its first year.

21

**Trustee and Executor Fees**

Ms. Lindsay and Mr. Modell were each paid fees of $12,000 on June 12, 2018 and again on October 6, 2018 for a total of $24,000 each or $48,000 in all during the first year. This is pursuant to the Notice sent to the beneficiaries in April of 2018, and based on 1% of $4.8 million in claimed assets. As set forth in the Findings of Fact, the calculation was based on an unjustified value of the farm property. The $3 million attributable to it is not based on reliable market value information. It is noteworthy that it was not used for purposes of the estate tax return and was not used for any other purpose other than calculation of trustee fees. Ms. Lindsay no doubt spent considerable time during the first year organizing the financial affairs of the Trust and she provided testimony with estimates of time spent showing that her trustee responsibilities were time-consuming during that period. However, the Co-Trustees did not keep contemporaneous records of time spent and chose instead to receive compensation based on a percentage basis.

While the court accepts that a percentage basis is a legitimate method for trustee compensation, the figure used for the calculation leading to $48,000 per year for trustee fees ($3.1 million for the farm property) has no legitimate basis. The size of the estate reported on the Form 706 for estate tax purposes was $1,790,920, nowhere near the $4,800,000 used for the percentage calculation and no other purpose. If the January 2018 inventory is adjusted to show the value of the farm as $615,000,[10] the value is $2,255,410 ($4,790,419 − 3,150,000 + 615,000 = $2,255,410). On that basis, total annual trustee fees based on percentage calculation would be $22,554.10. The court concludes that there was no basis for the $48,000 paid to the Trustees during the period of Accounting #1. An amount supported by the evidence is $22,554, or $11,277 for each Co-Trustee. Thus, the Trustees were overpaid by $25,446.

0n December 8, 2018, Ms. Lindsay and Mr. Modell were each paid $2,000 for fees as Executors of the Stewart Skrill Estate. It is inferable from the evidence that both were named executors. Although signature pages are missing from the exhibit, Ms. Lindsay is identified as executor on page 1 of the estate tax return, Form 706 (Exhibit O). While there is no evidence to support either how this fee was calculated or what work was performed, there was an estate that had to be probated in Florida, and a federal estate tax return had to be filed as a function of estate administration as opposed to trust administration. The court cannot conclude that the fees for the executors' responsibilities are unreasonable.

On April 17, 2019, Ms. Lindsay and Mr. Modell were each paid $11,250 for trustee fees. This amount is very close to the reasonable amount shown by the calculations above based on 1% of Trust value ($11,277 each). However, this payment was during the period of the second accounting when the Co-Trustees spent the year engaged in a hemp business that was financed by the invasion of principal of the Neuberger Berman account. They did not have the authority under the Amendment to invade the principal for that purpose, and the result was a serious reduction in principal value. This reduced the amount of income that could be generated for the

---

[10] While Town tax assessments are not always an accurate measure of fair market value, this is the only value supported by the evidence. The Co-Trustees did not obtain any reliable valuation.

support of Karen. The court declines to approve the $22,500 paid for trustee compensation in 2019 given that the work performed during that year was unjustified under Trust provisions and resulted in waste.

In sum, the court declines to approve the amount of $25,446 + 22,500 = $47,946 paid to the Co-Trustees for trustee compensation.

**Attorney Fees**

Total attorney fees paid in the three accountings are $178,496. Without invoices describing the work done, the court cannot determine that all of the work performed was needed and that the fees charged were reasonable. No doubt a fair amount of legal work was required to address regular issues of Trust administration plus the status of Daniel on the farm and the litigation brought about by Karen's petition. Attorneys fees that are the apparently unnecessary "second opinion" fees of Florida Attorney Mitchell Devack from September 4, 2018 and thereafter cannot be approved. This was after Stewart's death and after all assets were in the Trust. Ms. Lindsay identified his role during this period as "'overseer'/'reviewer'/'second opinion' for us." The Trustees had qualified Vermont counsel during this period and the need for a second opinion from a Florida attorney is not justified. The amount for this period is $11,263.60, which is not approved. In addition, Accounting #3 shows that $8,862.50 was paid to an unidentified law firm, most likely that of Mitchell Devack, for services that have not been supported as reasonable and necessary. Thus, the total attorney fees disallowed is $11,263.60 + 8,862.50 = $20,126.10.

**Summary**

The attorneys agree that the burden to show breach of trust is on the party claiming such breach. 14A V.S.A. § 1002 (a) provides that "A trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of: (1) the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) [omitted as not relevant]."

The court concludes that the Co-Trustees breached their duties as Co-Trustees in the following ways:

- Failure to respond to Karen's request for a report of trust activity 14A V.S.A. § 813 (a)
- Failure to report to beneficiaries at the end of each year 14A V.S.A. § 813 (c).
- Invasion of principal, specifically stocks in the Neuberger Berman account. after necessary initial expenses and distributions were complete, in order to invest in a business project on the farm rather than maintaining them solely to generate income for the support of Karen as required by the Trust, ¶3.7
- Investment in a high-risk vertically integrated hemp business that wasted principal stock assets of the Trust and was inconsistent with the purpose of the farm as set forth in ¶ 3.6
- Payment to themselves of trustee fees in excess of a reasonable amount using a percentage basis applied to an excessive and unsupported valuation of Trust assets
- Payment to themselves of trustee fees for work not authorized by Trust provisions

23

In addition to the breach of trust claim against the Co-Trustees as a basis for establishing liability on their part, 12 V.S.A. § 4255 authorizes the judge who reviews an accounting to "adjust the accounts between the parties."

The financial harm to the beneficiaries caused by both the breach of trust and the unjustified expenses in the accountings consists of $485,171.59 in loss of principal of the assets in the Trust, $47,946 in unjustified compensation paid to the Co-Trustees, and $20,126.10 in unjustified attorney fees.

Therefore, the Co-Trustees are liable to the Trust both as a necessary adjustment to the accountings and for breach of trust as follows:

1. $485,171.59 in loss of Trust principal, plus interest at the legal rate from July 31. 2020, which is the date of the third accounting establishing this figure,
2. $47,946 in disallowed trustee compensation, plus interest at the legal rate from April 15, 2019, the date of the last unapproved payment, and
3. $20,126.10 in unjustified attorney fees, plus interest at the legal rate from January 28, 2020, the date of the last payment of such fees.

The court issues a separate Judgment this day based on the foregoing.[11]

Electronically signed August 25, 2025 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

---

[11] The court understands that due to the Settlement Agreement that Ms. Lindsay made with Trustee Eckman and Karen Skrill in March of 2024, Trustee Eckman and/or Karen Skrill may not pursue collection against Ms. Lindsay. Nonetheless, since this is a *de novo* appeal of the performance of the Co-Trustees during the period that ended July 31, 2020, the court's Findings, Conclusions, and Order are based on the evidence as to both Co-Trustees for that period.